### Richmond

COMMONWEALTH OF VIRGINIA, DEPARTMENT OF TAXATION

v.

CHAMPION INTERNATIONAL CORPORATION

April 18, 1980.

Record No. 780651.

Present: All the Justices.

WEAVER BROS., INC.

v.

COMMONWEALTH OF VIRGINIA

April 18, 1980.

Record No. 781339.

Present: All the Justices.

COMMONWEALTH OF VIRGINIA, DEPARTMENT OF TAXATION

v.

MERRILL, LYNCH, PIERCE, FENNER & SMITH, INC.

April 18, 1980.

Record No. 790859.

Present: All the Justices.

*Norman K. Marshall, Assistant Attorney General (Marshall Coleman, Attorney General,* on briefs), for appellant. (Record No. 780651)

*William L. S. Rowe (H. Brice Graves; Dennis J. Barron [Ohio]; David A. Beanblossom [Ohio]; Hunton & Williams; Frost & Jacobs [Ohio],* on brief), for appellee. (Record No. 780651)

*Michael D. Fleming (Adams, Porter, Radigan & Mays,* on brief), for appellant. (Record No. 781339)

*Norman K. Marshall, Assistant Attorney General (Marshall Coleman, Attorney General,* on brief), for appellee. (Record No. 781339)

*Amicus Curiae; Bluefield Supply Company (Lathan M. Ewers, Jr.; William L. S. Rowe; Hunton & Williams,* on brief), for appellant. (Record No. 781339)

*Norman K. Marshall, Assistant Attorney General (Marshall Coleman, Attorney General; John G. MacConnell, Assistant Attorney General; Kenneth W. Thorson, Assistant Attorney General,* on brief), for appellant. (Record No. 790859)

*Allan G. Donn (James C. Howell; Willcox, Savage, Lawrence, Dickson & Spindle, P.C.,* on brief), for appellee. (Record No. 790859)

COCHRAN, J., delivered the opinion of the Court.

## PRELIMINARY STATEMENT.

Each of these appeals involves the taxation by the Commonwealth of certain income of a multistate foreign corporation doing business in Virginia. The appeals were argued consecutively in chronological order. Although the cases were separately tried in the courts below, and the evidence was not identical, construction of the same statutes is required to determine whether the trial courts correctly resolved the issues.

Champion International Corp. (Champion) was a New York corporation with headquarters outside Virginia, that manufactured and sold paper and building materials. In Virginia, it owned and operated a manufacturing plant and warehouses, and it owned land from which

timber was harvested. The income of Champion in controversy was derived almost entirely from the cutting of timber grown outside Virginia.

Weaver Bros., Inc. (Weaver) was a Delaware corporation, with headquarters in Maryland, that operated a mortgage banking business. It maintained branch offices in Virginia, through which it financed home purchasers, holding the mortgage notes for several months before selling them to investors. The income of Weaver in controversy was the interest earned on these notes.

Merrill Lynch, Pierce, Fenner & Smith, Inc. (Merrill Lynch) was a Delaware corporation, with headquarters in New York, that operated a securities brokerage business. It maintained branch offices in Virginia. Its income in controversy was the interest received on customers' margin accounts and bonds held in inventory, and dividends received on stocks held in inventory.

### THE STATUTORY PROVISIONS.

These appeals involve the construction of the following Virginia statutory provisions:

§ 58-151.01. **Meaning of terms; rules and regulations.**—(a) Any term used in this chapter shall have the same meaning as when used in a comparable context in the laws of the United States relating to federal income taxes, unless a different meaning is clearly required.

\* \* \*

§ 58-151.035. **Allocation and apportionment of income.**—Any corporation having income from business activity which is taxable both within and without this State, shall allocate and apportion its Virginia taxable income as provided in §§ 58-151.034 through 58-151.050.

§ 58-151.036. **When corporation deemed taxable in another state.**—For purposes of allocation and apportionment of income under §§ 58-151.034 through 58-151.050, a corporation is taxable in another state if (1) in that state it is subject to a net income tax or a franchise tax measured by net income, or (2) would be subject to a net income tax in any other such taxing jurisdiction if such other taxing jurisdiction adopted the income tax law of this State.

§ 58-151.037. **How certain items allocated.**—Rents and royalties from real or tangible personal property, capital gains

or losses from the sale or other disposition of real estate or tangible and intangible personal property, interest and dividends shall be allocated as provided in §§ 58-151.038 through 58-151.040.

\* \* \*

§ 58-151.039. **Capital gains and losses.**—(a) Capital gains and losses from sales or other disposition of real property located in this State are allocable to this State.

(b) Capital gains and losses from sales or other disposition of tangible personal property are allocable to this State if (1) the property had a situs in this State at the time of the sale or other disposition, or (2) the principal place from which the trade or business of the corporation is directed or managed is in this State and the corporation is not taxable in the state in which the property had a situs.

(c) Capital gains and losses from sales or other disposition of intangible personal property are allocable to this State if the principal place from which the trade or business of the corporation is directed or managed is in this State; provided, however, that capital gains and losses from sales or other disposition of stock or other securities of a subsidiary corporation of the selling or disposing corporation shall not be allocable under this section but shall be apportionable under § 58-151.041.

§ 58-151.040. **Interest and dividends.**—Interest and dividends are allocable to this State if the principal place from which the trade or business of the corporation is directed or managed is in this State; provided, however, that interest and dividends derived from investments in a subsidiary corporation of the recipient corporation shall not be allocable under this section but shall be apportionable under § 58-151.041. For the purposes of this section and § 58-151.039, a corporation shall be considered to be a subsidiary of another corporation if the latter owns more than fifty percent of the voting stock of such corporation.

§ 58-151.041. **What income apportioned and how.**—The Virginia taxable income of the corporation, excluding the classes of income allocable under §§ 58-151.037 through 58-151.040 shall be apportioned to this State by multiplying such income by a fraction, the numerator of which is the property factor plus the payroll factor, plus the sales factor, and the denominator of which is three, reduced by the number of factors, if any, having no denominator.

These statutes will be referred to herein as .01(a), .035, .036, .037, .039, .040, and .041, respectively.

## PROCEEDINGS IN THE TRIAL COURTS.

(1) In 1972, Champion reported income from timber transactions as capital gains in the total amount of $29,046,941, of which only $122 represented gains from timber cut in Virginia. Champion allocated the capital gains according to situs, $122 to Virginia and the remainder elsewhere. After an audit, the Department of Taxation (the Department) made a deficiency assessment based upon its conclusion that the income from all timber transactions was apportionable rather than allocable and accordingly was subject to the application of the three-factor formula prescribed in .041 for the taxation of Virginia taxable income of the corporation. Champion paid under protest, and applied to the trial court (the Circuit Court of the City of Richmond, Division I) for correction of an erroneous assessment. The trial court, ruling that the timber transactions were capital gains, and were not apportionable to Virginia, ordered that $28,806.95, with interest, be refunded to Champion. The Department has appealed.

(2) The Department, after auditing the tax returns of Weaver for 1972, 1973, and 1974, assessed deficiencies resulting from the taxpayer's treatment of interest income as allocable rather than apportionable. Weaver paid under protest, and applied to the trial court (the Circuit Court of Fairfax County) for correction of an erroneous assessment. The trial court, ruling that the income was apportionable, not allocable, and that the assessment was not erroneous, denied the taxpayer relief. Weaver has appealed the final order.

(3) Merrill Lynch allocated the entire amount of its interest and dividend income to New York for 1972 and 1973. In 1977, the Department assessed deficiencies resulting from the taxpayer's treatment of interest and dividend income as allocable rather than apportionable. Merrill Lynch paid under protest, and applied to the trial court (the Circuit Court of the City of Richmond, Division I) for correction of an erroneous assessment. The trial court ruled in favor of Merrill Lynch, holding that the income was allocable. The Department filed a notice of appeal but later reconsidered and exercised its statutory right to a rehearing. The Department's motion to stay the proceedings pending the disposition of the appeal in *Weaver* was denied, and the rehearing, at which the Tax Commissioner testified, was conducted. Again, the trial court ruled in favor of the taxpayer and entered final judgment ordering that the stipulated

amount of the refund, with interest, be paid to Merrill Lynch. The Department has appealed.

Thus, opposite results were reached by the trial court in *Weaver* and the trial court in *Merrill Lynch*, although the dispositive legal question was the same in each case.

### THE ISSUES ON APPEAL.

In each instance, the taxpayer treated the income in controversy as allocable income, whereas the Department treated it as apportionable income. In *Champion,* the question is whether timber transactions effected in the regular course of business are capital gains under the Virginia statutes. If not, such income is apportionable; if so, the additional question must be determined, whether this income is allocable or apportionable. *Weaver* and *Merrill Lynch* present the single question whether income from interest and/or dividends received in the regular course of business is allocable or apportionable.

### THE APPEALS.

#### 1. CHAMPION.

The parties stipulated that Champion elected pursuant to Section 631(a) of the Internal Revenue Code of 1954 (IRC), to have the cutting of timber for sale or for use in its trade or business considered for federal tax purposes as a sale or exchange of such timber. Under IRC Section 1231(a), if gains on sales or exchanges of property used in the trade or business exceed losses, the gains and losses "shall be considered as gains and losses from sales or exchanges of capital assets . . .", but if such gains do not exceed losses the gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. Under IRC Section 1231(b)(2), timber is included within the definition of property used in the trade or business, if the election authorized by IRC Section 631(a) has been made. Champion reported its timber transactions on its 1972 federal income tax return as capital gains.

The Department contends that the timber transactions, though treated as capital gains for federal tax purposes, were not capital gains. It relies upon IRC Section 1222 that defines capital gains and capital losses as gains or losses arising from sales or exchanges of capital assets. IRC Section 1221 defines capital assets as all assets except those expressly excluded; the excluded assets may be categorized generally as those used in the active conduct of the trade or business.

The Department contends that .037, requiring allocation of "capital

gains or losses", is limited to capital gains or losses as the terms are defined in IRC, meaning only those arising from the sale or exchange of IRC Section 1221 assets. The Department urges this construction, because net losses under IRC Section 1231 are treated as ordinary losses, whereas net losses under IRC Sections 1221 and 1222 are capital losses. Thus, the reasoning goes, only IRC Section 1221 assets give rise to both capital gains and capital losses. IRC Section 1231 assets are subject to treatment as assets for capital gains purposes, but not for capital losses. Accordingly, the Department argues, in referring to "capital gains or losses", .037 must necessarily have excluded IRC Section 1231 assets.

Champion, while not conceding that its timber is not a capital asset, argues that the language of .037 and .039 renders the classification of the asset irrelevant. We agree that these provisions apply to "capital gains" rather than to "capital assets".

The Department argues that even if the timber transactions are capital gains they are not allocable because only income arising from "transactions outside a corporation's normal business operations" are allocable. Under this theory, only income arising from sale or exchange of IRC Section 1221 assets is allocable. The Department represents that it has consistently maintained this position since 1972, and offers various hypothetical examples illustrating the unjustified reduction of Virginia taxes which any alternative construction would allow a multistate corporation. Indeed, the Department notes the absence of an express provision for allocation of any income from capital gains to a foreign jurisdiction, as .039 limits the allocation of such income to Virginia. However, the statute specifies the types of allocable incomes, as well as the conditions for allocation to Virginia, and, by implication, allocation to other states. Moreover, the Department concedes that it has construed the Virginia statute to permit allocation to foreign jurisdictions of income from capital gains on sales or exchanges of IRC Section 1221 (nonbusiness) assets.

In oral argument before us, counsel for the Department conceded that the distinction between business and nonbusiness assets has been drawn only recently, beginning with the installation of the present State Tax Commissioner, William H. Forst, in 1972.[1] The record contains two letters signed by Commissioner Forst in November and December, 1974, respectively, each addressed to an individual, ex-

---

[1] Edward A. Dore, Director of the Income Tax Division of the Department, testified that upon sale of an IRC Section 1231 asset in West Virginia prior to 1972 the capital gain would have been allocated to West Virginia, but that if the sale had been made after 1972, no such allocation would have been approved.

pressing the opinion that allocation was limited to capital gains or losses resulting from the sale or exchange of IRC Section 1221 assets. A letter signed by Commissioner Forst June 5, 1975, addressed to a representative of Champion, advised that the timber transactions of Champion were not capital assets and the sale or exchange of the assets was income that was apportionable and not allocable.

Quite apparently, the Department changed its policy regarding the allocation of capital gains by multistate corporations no earlier than 1972, and did not, as counsel for the Department suggested, merely begin to implement preexisting policy through interstate audits that previously could not be made. The policy change appears to have been made after the enactment in 1971 of Code § 58-151.01(a), *et seq.,* conforming the Virginia income 'tax laws to the laws of the United States relating to federal income taxes. The change, based upon the distinction between business and nonbusiness income, is consistent with the provisions of the Uniform Division of Income for Tax Purposes Act (the Uniform Act). Nevertheless, the record shows that the instructions for the tax year 1974 stated for the first time that only gains or losses from sale of IRC Section 1221 assets could be allocated. Consequently, only the instructions for 1974 and subsequent tax years gave public notice of the policy change.

A brief review of the legislative history of the Virginia statute explains the absence of any distinction between business and nonbusiness income. Pursuant to a study made by the Virginia Advisory Legislative Council, as directed by Senate Joint Resolution No. 11, Acts 1958, page 1114,[2] C. H. Morrissett, the State Tax Commissioner, working with a group of lawyers, including William L. Zimmer, III, drafted the proposed legislation. In a letter to Morrissett dated August 14, 1959, Zimmer recommended elimination of the distinction between business and nonbusiness income to simplify administration for the taxpayer and the Department. Moreover, he wrote, nonbusiness income represented a relatively minor portion of total income, and elimination of the distinction would not significantly diminish tax collections. Morrissett replied by letter dated November 4, 1959, enclosing a revised draft, and advising that he had accepted Zimmer's suggestion and had eliminated the distinction. Morrissett's revised draft was enacted into law in 1960 without distinction between busi-

---

[2] The study was prompted to promote industrial development, the preamble to the resolution stating that "the opinion is widely held that the present provisions of the tax laws of Virginia regarding the apportionment of the income taxes of foreign corporations doing business in Virginia are detrimental to the attraction of new industries. . . ."

ness and nonbusiness income. Acts 1960, c. 442. Indeed, counsel for the Department in the trial court conceded that "the distinction between business and nonbusiness income was not carried over into the Virginia law".

Comparison of the Virginia statute with the Uniform Act is equally revealing. The Uniform Act defined "business income" and "nonbusiness income"; the Virginia statute does not. The Uniform Act provided for the allocation of nonbusiness income; the Virginia statute does not. The Uniform Act provided for the apportionment of business income; the Virginia Act does not. We reject the Department's suggestion that the General Assembly omitted the significant language of the Act as surplusage. Moreover, when the Virginia income tax statutes were conformed with the federal laws in 1971 (Acts 1971, Ex. Sess., c. 171), the provisions for allocation and apportionment were incorporated without change.

From the foregoing, we perceive a clear legislative intent to omit the distinction between business and nonbusiness income. The omission was deliberate and intentional. Because the Department's new policy of recognizing such a difference violates legislative purpose and contravenes a long-standing interpretive history, this new approach constitutes an invalid and impermissible encroachment upon the prerogatives of the legislative branch.

Even assuming *arguendo* that the statute is subject to a change in administrative interpretation, there is evidence that the Department published no regulations or instructions mandating the distinction between business and nonbusiness income for the tax years in question. The Department may not rely upon administrative policy not promulgated to the public. If the interpretation placed upon a statute by those charged with its enforcement has continued for a long period of time, it is presumed the legislature has acquiesced in the interpretation. *Peyton* v. *Williams,* 206 Va. 595, 600-01, 145 S.E.2d 147, 151 (1965). But the presumption of legislative acquiescence presupposes knowledge of the administrative construction. Without publication of the construction placed upon the statute by the Department, no presumption of legislative acquiescence attaches.

From our review of the record before us, we conclude that the Department undertook to amend the statute by making a change in administrative interpretation and applying the change retroactively. The Department has advanced ingenious arguments in support of its position, including the prediction of dire consequences in tax collections that may result from rejection of the Department's construction of the statutes. These arguments, however, should be addressed to the

General Assembly, which may decide to change the law approved in 1960 by incorporating all the provisions of the Uniform Act into our statute. But any such change in the law, made only after the legislators and other interested persons have had a full opportunity to consider and debate the advantages and disadvantages of the proposal, will be the responsibility of elected representatives accountable to their constituents.

We hold that the trial court did not err in ruling that the timber transactions of Champion constituted allocable capital gains, and that the taxpayer was entitled to a refund of taxes erroneously assessed in the amount stipulated, plus interest.

## 2. WEAVER

■ The interest income of Weaver in controversy was stipulated to be income earned in the ordinary course of business. In ruling that this income was subject to apportionment, the trial court, relying upon *Jefferson* v. *Tax Comm.*, 217 Va. 988, 234 S.E.2d 297 (1977), and *Commonwealth* v. *Research Analysis,* 214 Va. 161, 198 S.E.2d 622 (1973), held that the State Tax Commissioner's construction of the statute was entitled to great weight. However, in those cases, unlike the present case, the constructions were embodied in published regulations.

As we have already demonstrated, there is no distinction in the Virginia statute between business and nonbusiness income, and the omission of the distinction found in the Uniform Act was deliberate and intentional. Under .037, interest is allocable. Under .040, interest is allocable to Virginia if the principal place from which the trade or business is directed or managed is in Virginia, except that interest from investments in a subsidiary corporation is apportionable under .041. The Virginia taxable income of the corporation, "excluding the classes of income allocable under §§ 58-151.037 through 58-151.040 shall be apportioned" to Virginia. The plain meaning of these provisions is that interest income, however earned, is allocable, and is expressly excluded from apportionment by the language of .041.

Code § 58-151.050:1, enacted in 1976 (Acts 1976, c. 436) and amended in 1979 (Acts 1979, c. 32) applies to financial corporations. Weaver concedes that it is now controlled by this statute, which specifically provides for the apportionment of the "business income" of a financial corporation. The significance of this statute is, not that it harmonizes with the Department's position in the present case, as the trial court noted, but that it contained explicit language expressing the legislative intent to deal with business income of a specified category

of corporations. This language strongly indicates the legislative intent not to distinguish between business and nonbusiness income of other corporations. Moreover, it gives rise to a presumption of a legislative intent in respect to financial corporations to change an existing law. *Boyd* v. *Commonwealth,* 216 Va. 16, 20, 215 S.E.2d 915, 918 (1975).

Assuming, *arguendo,* as we did in *Champion, supra,* that the statute is subject to administrative interpretation, the evidence does not support the Department's position. The evidence adduced to show the Department's construction of the statute as mandating the distinction between business and nonbusiness income was an exhibit entitled "Corporation Income Tax Circular No. 5", dated September 24, 1975. But Tax Commissioner Forst conceded that this circular had never been adopted, issued as a regulation, or even signed by him. It had never before been publicly disclosed and was characterized by Forst as "nothing but a proposed Circular No. 5". No other written evidence was presented to corroborate Forst's testimony as to the Department's policy in respect to treatment of interest income. Such a confidential manner of making a change in policy cannot be upheld. The public is entitled to prospective notice of changes in the administrative construction of statutes.

We hold that the trial court erred in ruling that the income taxes in controversy were not erroneously assessed, and that Weaver was not entitled to relief. The amount in controversy is not disputed. Accordingly, we will reverse the judgment of the trial court and enter judgment here for Weaver in the amount of $95,174.89, plus interest.

### 3. MERRILL LYNCH.

Inasmuch as the Merrill Lynch case was heard twice in the trial court, the record is more complete than that in *Weaver.* Upon rehearing, it was stipulated that Merrill Lynch allocated all its interest and dividend income for 1972 and 1973 to the state of its principal place of business, and that the Department reclassified this income from allocable to apportionable and assessed tax deficiencies. The parties further stipulated that the Department's position was published for the first time in instructions for the 1976 tax form, and that it was put in memorandum form for internal use by the Department by document dated September 24, 1975.

The trial court rejected the Department's several contentions that .037, providing for allocation of income from interest and dividends, applies only to nonbusiness income, that the legislative intent manifestly favors this position, that interpretations of the Department carry

great weight, and that any other construction would be meaningless. The court ruled that .037 and .040 were clear and unambiguous, that the General Assembly has not expressly or by implication distinguished between interest and dividends derived from business activities and such income derived from "more passive investments", and that .041 provides for apportionment only for income not made allocable under .037. Accordingly, the income in question was allocable, and the trial court entered judgment for Merrill Lynch in the stipulated amount, $17,881.31, plus interest.

We have already demonstrated that the Virginia statute makes no distinction between business income and nonbusiness income. In this respect, it differs from the provisions of the Uniform Act. We have also noted that when the Virginia income tax laws in 1971 were brought into conformity with the federal laws providing for federal income taxation, no substantive changes were made in the allocation and apportionment provisions of the Virginia statute. And we have shown that the history of the Virginia law, adopted in 1960, shows conclusively that the elimination of the distinction between business and nonbusiness income was done intentionally and not by oversight or to eliminate surplus language. The terms "allocation" and "apportionment", as used in the Uniform Act, are unquestionably keyed to the business-nonbusiness distinction. These terms, however, which generally may be, as the Department says, words of art because of such usage, cannot be defined in Virginia upon the basis of a distinction that has been rejected. An unrestricted meaning is clearly required and, under .01(a), it will prevail.

The Instructions for Schedule A of Form 500 for 1972, 1973, 1974, and 1975, introduced into evidence, provided that interest and dividends "are allocable to the State where the principal place from which the trade or business of the corporation is directed or managed". It was stipulated that the first time any instruction to the contrary was published was in the Instructions for Schedule A of Form 500 for 1976. The Department's suggestion is unpersuasive that the change was unnecessary because multistate corporations must have known, from their familiarity with the Uniform Act, that interest and dividend income was apportionable. The legislative history, the wording of the statute, and at least a decade of consistent administration all plainly negate such a theory.

In oral argument, counsel for the Department challenged the trial court's ruling that .041 permits apportionment "only in cases not covered as allocable" under .037. The Department contends that the word "allocable" in .041 should be construed to mean "allocated",

so that the exclusionary clause is limited to the income actually allocated under the preceding sections. The term "classes of income" found in the exclusionary clause refers, in the Department's view, to that portion of Merrill Lynch's interest and dividend income that shares the "common attribute" of being actually allocated under §§ .037 through .040. Moreover, the Department argues, a holding that "classes" is the key word that excludes interest and dividend income from apportionment conflicts with the provision of .040 requiring apportionment rather than allocation of such income of a subsidiary corporation. Finally, the Department urges us not to attach "conclusive significance" to the choice by the General Assembly of the word "allocable" rather than "allocated" because the General Assembly "is somewhat imprecise in its choice of language" in "many revenue statutes". We find these arguments singularly unimpressive, and we reject them.

There is no reason to believe that State Tax Commissioner Morrissette, who drafted the statute after changes in the method of taxing multistate corporations had been recommended, the committees of the General Assembly that studied the proposed legislation, and the General Assembly itself, which enacted the proposals into law, either did not know the difference between "allocable" and "allocated" or inadvertently selected the wrong word. There is a presumption that the General Assembly, especially in a matter of such unusual importance, knew its business and did exactly what it intended. *See Greer* v. *Dillard,* 213 Va. 477, 479, 193 S.E.2d 668, 670 (1973). This presumption has not been rebutted. The "classes" referred to in the exclusionary clause of .041 are those kinds of income explicitly listed in .037, .038, .039, and .040 which have the common attribute of being allocable, not allocated. As to the contention that construing "classes" to exclude interest and dividend income from apportionment conflicts with the .040 exception applying to subsidiary corporations, the exception is by definition inconsistent with the general rule otherwise applicable.

We hold that the trial court did not err in ruling that the interest and dividend income of Merrill Lynch was allocable, and that the taxpayer was entitled to a refund of taxes erroneously assessed in the amount stipulated, plus interest.

*Affirmed.* (Record No. 780651)
*Reversed and final judgment.*
(Record No. 781339)
*Affirmed.* (Record No. 790859)